## PETITION: UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

**Plaintiff**



> Gordon Knight
> 7198 Indian Wells
> Sanger TX 76266

DEC 0 1 2025

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

v.

**Defendant**

4:25CV1304 JDK/KNM

> Paymentech LLC
> 14221 Dallas Pkwy, Building 2
> Dallas TX 75254

gordon. knight @ psknight.com
940 843 5511

**JURY TRIAL DEMANDED**

### PLAINTIFF'S STATEMENT OF CLAIM

**The Plaintiff:**

The Plaintiff is Gordon Knight ("Knight"), resident of Texas and sole owner of PS Knight Americas Inc ("PSK"), a TX corporation operating in and from the Denton area of North Texas, publishing electrical guidebooks for the Canadian market.

**The Defendant:**

Paymentech LLC ("Paymentech"), a subsidiary of JP Morgan Chase with headquarters at 14221 Dallas Pkwy, Dallas TX, 75254 and principal operations located at 8181 Communications Pkwy, Plano TX, 75024, is a merchant account provider formerly furnishing credit card processing services in contract to PSK.

Upon best information, Paymentech is a limited liability company existing under the laws of the State of Delaware and is owned by Paymentech Solutions LLC, itself owned by JP Morgan Chase & Co. Paymentech's Registered Agent is CT Corporation System at 1999 Bryan St, Ste 900, Dallas TX, 75201-3136.

1

**Nature of the Action:**

1.  The Defendant, Paymentech, in defiance of a Fifth Circuit Ruling, did knowingly cause and / or effect in the benefit of a foreign government;

    - The termination of PSK retail sales resulting in financial loss to both PSK and Knight;
    - The unilateral cancellation of the PSK – Paymentech contract resulting in the total loss of PSK retail sales and consequent damage to PSK and Knight;
    - The unlawful seizure of PSK funds in Paymentech's possession, further damaging PSK and Knight;
    - The illegitimate tarnishing of the PSK brand and Knight's reputation in terminating PSK's presence in its own market, and;
    - The illegitimate slandering of PSK and Knight as money launderers and terrorists.

2.  Specifically, Paymentech's partner FFB ("FFB", bda: Fresno First Bank) fraudulently designated both PSK and Knight on the Member Alert to Control High-Risk ("MATCH") financial blacklist, an anti-terrorism and anti-money laundering ("AML") protocol. Paymentech, without conducting even basic due diligence and in full knowledge of a Fifth Circuit Ruling exonerating both PSK and Knight, and indeed in possession of that Ruling, acted upon their partner's fraudulent designation to harm PSK and Knight.

3.  Upon Knight's information and belief, Paymentech committed the fraudulent designation under the direction of CSA Group (aka; Canadian Standards Association), an Agency of the Government of Canada and PSK's commercial competitor ("CSA"), in order to harm PSK and thereby to harm Knight. In this, Paymentech was acting on the direction of FFB, itself under the direction of a foreign government in harming a Texas corporation and its owner, Knight.

4.  PSK is the sole financial asset and only revenue source for Knight. Paymentech's fraudulent conduct resulted in the total and ongoing cessation of PSK's retail sales.

5.  In these actions and through these consequences, Paymentech has inflicted financial and reputational harm through its fraudulent conduct on both PSK and its owner, the Defendant, Knight.

6.  A very limited PSK Claim against Paymentech was filed in The Justice Court, Precinct 5, Denton County, Texas, on May 23, 2025 [S25-0072J5], along with the related PS Knight Americas Inc v. AltruPay filing in the same Court [S25-0068J5]. This first filing against Paymentech was dismissed without prejudice on November 10, 2025 for Lack of Personal Jurisdiction [Ref p.56]. This filing against Paymentech by Knight in Federal Court is a revision of the original Justice Court filing, broadened in the absence of Justice Court restrictions of scale, severity, and compensation.

7.  In the context of PSK and Knight's severe and ongoing financial constriction at the hands of Paymentech, this pro se Federal Court filing by Knight, as the ultimate affected party, is the only recourse financially viable under circumstances created by Paymentech on the instructions of their partner, FFB.

8.    Knight brings this civil action and seeks;

    a.   A Finding that the PSK contract was falsely terminated by Paymentech;

    b.   A Finding that Paymentech falsely designated PSK as an entity engaged in fraudulent activity while in possession of the fully exonerating Fifth Circuit Ruling;

    c.   A Finding that Paymentech's fraudulent conduct toward PSK and Knight constitutes a breach of contract;

    d.   A Finding that by its fraudulent conduct toward Knight and his company, Paymentech is responsible for resulting financial harm on PSK and, directly and by extension, Knight, and an Order for compensation;

    e.   A Finding that by its fraudulent conduct toward PSK and Knight, Paymentech is responsible for public disparaging of PSK and misrepresenting PSK conduct, constituting false, misleading and deceptive business practice, is a defamation of PSK and, directly and by extension, Knight, and an Order for compensation;

    f.   An Order that Paymentech remove its false designation of PSK as involved in fraudulent conduct and restore the PSK contract, amended to preclude unilateral termination in the absence of unlawful conduct by PSK;

    g.   An Order for compensation in the sum of all matters being $20MM, a placeholder amount;

    h.   A Finding in this matter before the Court that Paymentech is under the direction of FFB, itself under the direction or control of the Government of Canada through the latter's Agency; CSA;

    i.   A Finding that Paymentech has, in this instance, unlawfully operated as an arm of a foreign power (Canada) inside the United States to impede, harass, and harm a citizen of the United States (PSK) and its owner (Knight), and;

    j.   A Finding that based on the above, Paymentech is in breach of the following Causes, Federal and State Statutes and Executive Orders, subsequently actionable in criminal proceedings, listed as;

        -   Breach of Contract
        -   Lantham Act
        -   Commercial Disparagement
        -   Defamation
        -   Tortious Interference
        -   Negligence
        -   Bank Fraud Statute
        -   Bank Secrecy Act
        -   Wire Fraud Act
        -   Consumer Financial Protection Act

**Jurisdiction and Venue**

9.    The United States District Court, Eastern District of Texas is the correct jurisdiction because all claims are Federal, and;

10.    The United States District Court, Eastern District of Texas, is the correct venue because Knight is resident within Denton County, within which FFB's actions against PSK and Knight were affected.


**Factual Background**

Who is the Canadian Standards Association?

11.    The Canadian Standards Association ("CSA") has described itself as a "private not-for-profit corporation" in most of its legal filings in the United States [Ref. p.57, 59, 64].

12.    In public however, CSA has claimed a variety of contradictory legal statuses.  In China, CSA claims to be an Agency of the Government of Canada.  Across the straight in Taiwan, CSA claims to be a US corporation headquartered in Ohio.  In the US, CSA claims to be an ISO, an International Standards Organization without nationality.  To the IRS, CSA has registered as a Business League and is therefore tax exempt [Ref. p.113 - 118].  To US customers, CSA claims to be a corporation offering products and services, though both are barred by its Business League registration.  To US corporations, CSA claims to be a regulatory body authorized to sell them influence over the drafting of domestic laws in Canada and, to an extent, laws in the US as well [Ref. p.119 - 120].  To community groups and activists, CSA claims to be a likeminded public interest body working for the greater good and drafting standards, not laws [Ref. p.121 - 127].  Hiding in ambiguity, CSA claims to be whatever they perceive the audience needs to hear to deliver to CSA whatever they want.

13.    Of CSA's many conflicting legal status claims, only one is accurate; CSA is an Agency of the Government of Canada.  Examples follow.

14.    Government has affirmed that CSA "is in fact a public entity.  It is an extension of the arm of the Government of Canada.  All of its employees work for the Government of Canada.  Its processes are pursuant to the Government of Canada" [Ref. p.148 - Lines 15 - 40, 149 - Lines 6 - 21].

15.    CSA's unionized staff are members of a public sector union, the Canadian Union of Public Employees (CUPE), Locals 967 and 4559 [Ref. p.172 - 174, 205].  CUPE entered CSA in 1970, at the same time CUPE unionized the other Government departments and agencies which form the current CUPE locals.

16.    On December 16, 2016, Government testified in Ontario Court that "these [CSA staff] are public officials, which they are" [Ref. p.227 - Line 29].  Further, CSA "is a public authority" [Ref. p.229 - Line 14, 149 - Line 25].

17.    Justice Quamina of Ontario Court Ruled that CSA is part of Government, in the least standing under "loco parentis" with regard to higher government authorities and is established by

Government statute [Ref. p.302 - Line 10 - 20], and pointed out that CSA salaries are "set by the Government" [Ref. p.304 - Line 15]. The Court noted that its Ruling with regard to CSA was directed "to the Government," not to a not-for-profit [Ref. p.302 - Line 19].

18.   CSA's own Board of Directors have questioned its legal status. In a meeting of the Board's Executive Operations Committee on October 12, 2012, Board Members authored and requested discussion of the question; "Who owns us and why are we here," and relatedly asked; "Have we outgrown our Legislative Mandate?" [Punctuation in original] [Ref p.408 - 409]

19.   As for history, the CSA was founded in London, UK in 1917 by the then Government of the British Empire [Ref. p.149, 312 - 319]. This founding is verifiable through original, though peripheral sources, those in British Government Archives for instance but Canadian records are restricted from public access by CSA. This restriction was demonstrated as a number of Members of Parliament, acting on Knight's behalf, requested access to original patriation documents for CSA, covering the transfer of the Agency from the British Empire to the Dominion of Canada, and were stalled for months, then denied entirely. CSA itself refuses to comply with Canada's version of Freedom of Information filings (Access to Information and Protection of Privacy, or ATIP, filings) based on its claim to be a private entity.

20.   Government has admitted in Court that "…pursuant to its creation by either the previous entity, the British Government and its subsequent entity of the Government of Canada […]" [Ref. p.227 - Line 16].

21.   Whereas CSA has repeatedly testified in Court that it was founded in 1919, they have declined to explain how CSA sent delegates to a series of munitions conferences during the First World War (in October, 1917 and April, 1918) [Ref. p.314, 323 - 325], or how CSA appointed two subcommittees on munitions two years before they claim to have existed [Ref. p.325]. According to British archive, CSA delegations were accredited as Canadian Government representatives at munitions conferences.

22.   CSA is also listed as a Government Agency in municipal phone directories in every year from patriation to Canada in 1919 until 1970, when Parliamentarians began asking pointed questions as to CSA's legal status [Ref. p.50 - 55].

23.   Likewise, the Canadian Federal Government's own internal telephone directories show CSA as a Federal Agency, housed in Government buildings and within Government departments, consistently, year after year, for decades. These directories not only record CSA as a Government Agency, but also show CSA as a subsidiary tenant of Industry Canada occupying a series of Government offices over the course of decades [Ref. p.1 – 49].

24.   CSA has been afforded powers of legislation and runs Parliamentary legislative committees, unilaterally amending by their own admission >2,000 laws [Ref. p.57, 327,328 - 330].

25.   Indeed, CSA has been granted "Accepted-as-Amended" authority to change / edit / amend domestic law without Parliamentary or other legislative review. In example, the Province of Alberta is one of many such Canadian jurisdictions in which CSA has autonomous legislative authority [Ref. p.331 - 334, more examples at 335, 336]. Such authority is intrinsically both

legislative and public, not private. It is noteworthy that CSA denies the existence of this authority in public [Ref. p.57].

26.    CSA has been granted "limited protections from civil proceedings," that is, legislative immunities for their Government functions [Ref. p.340].  Such immunities are only granted to government bodies, those deemed non-litigable as such entities are acting in the name of the Government of Canada and purportedly in the interests of the citizens of Canada.

27.    As with other Government Agencies, CSA was granted franking privileges, allowing them to ship anything from postcards to pallets, mail or freight, without charge as a departmental expense of the Canadian Government [Ref. p.315; See also p.312 - 319].  In this, whenever CSA sent something, the words "Government of Canada" were found where the postmark would normally appear.

28.    In 2014, the then CEO of CSA, Ash Sahi, admitted during negotiations with Knight that CSA was, and remains, an Agency of Canada's Government [Ref. p.345 - 346].

29.    Courts in Canada and the US have repeatedly ruled on assessing the actual legal status of entities cloaked in ambiguity, as between public vs private.

30.    In Canada, the key legal principles involved in such assessments are;

- the Nature of the Entity;
- the Degree of Government Direction or Control;
- the Nature of the Function, and;
- the Statutory Context.

Nature of the Entity

31.    Is the entity inherently governmental?  That is, was it created by the national government with government appointments or funding?  Alternately, is the entity structurally and by its inception private?

32.    CSA was created by Royal Charter of the British Government in 1917 as an entity reporting to the Privy Council Office, then patriated via bilateral agreement with Canada in 1919 and given a Canadian Government Charter as an Agency of the Department of Industry and Trade, and staffed and funded directly by the Canadian Government.  There has been only one change to CSA's Charter since inception, in 1944, which altered sundry items including a shortening of its name but did not change its reporting, funding, direction, or governmental authorities.

Canadian Supreme Court Example;

**CCH Canadian Ltd. v. Law Society of Upper Canada, 2004 SCC 13**

Degree of Government Direction or Control

33.     Is the entity under routine or regular government control (e.g.; board appointments, policy approvals, funding)? Or does the entity enjoy deep operational autonomy?

34.     CSA reports to the Minister of Industry via the Standards Council of Canada (itself an entity of the Department of Industry, created in 1970), and CSA is entirely operationally devoted to regulatory activity (drafting legislation, inspecting and certifying regulatory compliance), usually has representation on its board from other government Agencies, and CSA has been heavily funded by the Canada's Federal Treasury in every year for the last 106 years.

                    Canadian Supreme Court Examples;

                              **Greater Vancouver Transportation Authority v. Canadian Federation of Students — British Columbia Component, [2009] 2 S.C.R. 295**
                              **Stoffman v. Vancouver General Hospital, [1990] 3 S.C.R. 483**
                              **Douglas/Kwantlen Faculty Assn. v. Douglas College, [1990] 3 S.C.R. 570**

Nature of the Function

35.     Is the entity performing a specifically governmental function or implementing a government policy?

36.     CSA is drafting and amending legislation.  As noted above, CSA has authority to run legislative committees and, through Accepted-as-Amended provisions, may alter the text of law without Parliamentary review.  With this authority, when CSA amends legislation that change is automatically law and immediately enforceable as law.  This function and authority is unambiguously governmental.

                    Canadian Supreme Court Examples;

                              **Eldridge v. British Columbia (Attorney General), [1997] 3 S.C.R. 624**
                              **Stoffman v. Vancouver General Hospital, [1990] 3 S.C.R. 483**

Statutory Context

37.     In non-Charter of Rights and Freedoms cases, Canada's courts examine the entity's statutory purpose in determining its public or private character.

38.     CSA was created by government specifically to draft legislation and regulations.  This is intrinsically governmental.  The statutory purpose is plain.

                    Canadian Supreme Court Examples;

                              **Greater Vancouver Transportation Authority v. Canadian Federation of Students — British Columbia Component, [2009] 2 S.C.R. 295**

**Douglas/Kwantlen Faculty Assn. v. Douglas College, [1990] 3 S.C.R. 570**

39.   Likewise, United States' courts have ruled on assessing legal status of seemingly private entities enjoying government powers.  Similar to Canadian rulings, US courts focus on;

- Questions of creation and control of the entity;
- Their operational purpose, and;
- The constitutional context (the specific right or obligation at issue).

US Court Examples;

**McCulloch v. Maryland (1819)**
**Dartmouth College v. Woodward (1819)**
**Bank of Augusta v. Earle (1839)**
**Lebron v. National Railroad Passenger Corp. (Amtrak) (1995)**
**Department of Transportation v. Association of American Railroads (2015)**

40.   Historically, cases like McCulloch and Dartmouth established parameters for distinguishing public and private corporations, while modern cases like Lebron refine the analysis for government-created entities. Notably, Courts have been more inclined to treat corporations as private when granting constitutional protections (e.g., Santa Clara) but as public when imposing constitutional obligations (e.g., Amtrak).

41.   Given CSA's Government status in its home Country, that Country's case law affirming that status, CSA's own statements and other Canadian Government statements affirming its Government Status, and its ongoing operation as a Government entity, there seems little room in US law to conclude that CSA is anything other than what it appears to be; an Agency of the Federal Government of Canada.

## The Plaintiff and its Business

42.   PSK was founded as PS Knight Co Ltd in Canada in 1967 and continued into TX in 2020.  The relocation of PSK was a direct result of excessive competitive pressure in Canada from PSK's only competitor, a Canadian Government Agency of Industry Canada (Dept. of Trade and Industry) called CSA Group ("CSA").

43.   CSA drafts more than 2,000 laws in Canada, including electrical law.  PSK's guidebooks reference and quote from the law for purposes of instructing on compliance with law.

44.   In 2012, CSA started a series of litigations against PSK, claiming that PSK was breaching their copyright in "their" laws by quoting from electrical laws that CSA had a role in drafting.  That is, CSA was claiming to own Canadian legislation privately.  Their argument to Court was that nobody can reference the law, quote from the law, or instruct on the law without paying CSA a

royalty for doing so.  In reality, CSA was trying to get rid of PSK books, the only competition to theirs.  In all, CSA launched eight near-duplicate litigations against PSK.

45.    One of these CSA lawsuits against PSK was filed in US Federal Court in 2021.  In this lawsuit, CSA argued that Rulings of courts in Canada are enforceable inside the United States, even if the provisions of these Rulings conflict with US law.  In this instance, they argued that Canadian Rulings stating that laws in Canada, including electrical laws, are privately owned and are therefore subject to restricted access by the private owners must also apply inside the United States.  In this context, PSK's guidebooks which quote from Canadian law should be banned by US courts in order to comply with Canadian Rulings, even though US law does not acknowledge private ownership of legislation.

46.    On Aug 9 2024, the Fifth Circuit Court of Appeal decisively Ruled in favor of PSK [Ref p.347 – 364, 365].  According to the Ruling, Canada's decision to make legislation private property is not enforceable inside the US and therefore PSK did not violate US law with its product sales, has not been selling illegal products, and is not barred from publishing and selling guidebooks on Canadian electrical laws from the United States.

47.    CSA appealed the Fifth Circuit Ruling to the Supreme Court and on Jan 21, 2025 their appeal was declined [Ref p.368].  The matter is therefore no longer litigable.  PSK is vindicated, PSK books are lawful and legitimate, and PSK publication and sale of them from the US is legal.

48.    While these cases and appeals were underway, CSA started targeting PSK vendors, clients, and contractors and sullying PSK's reputation in the market.

49.    Specifically and in example, CSA issued a public "Safety Alert" regarding PSK books, claiming 180 "differences" between PSK book and their version of PSK books, which "raise urgent safety issues" to the safety of the public [Ref p.396].

50.    Among the "urgent" safety issues was the spelling of "wastewater" (CSA) vs "waste water" (PSK).  However baseless, CSA posted their safety notice on their government website and sent copies of it to academic markets, contractors - everyone they could think of that dealt with PSK.  Then CSA had the Provincial Government of British Columbia blacklist certain PSK books entirely on this basis.

51.    CSA began using its governmental authorities to extrajudicially harass and harm PSK.  Threat letters on Government letterhead were sent to PSK vendors, contractors, (etc.) telling them to refrain from using PSK books as they infringed copyright, were erroneous and thus dangerous to public safety.  CSA succeeded in having PSK websites repeatedly taken down on this basis, most recently in November, 2021.

52.    In the fall of 2022, PSK published *Deep 6 Diaries*, a book chronologizing PSK's CSA experience, the story of their targeting PSK.  In response, after the *Deep 6 Diaries* release announcement CSA advised credit card companies and US financial institutions that PSK had been found guilty of money laundering in Canada.  This was untrue but it resulted in PSK being put for the first time on the anti-money laundering and anti-terrorism blacklist, called the Member Alert to Control High-Risk list (the "MATCH" list).  The first listing of PSK on MATCH was via CSA proxy BMO Bank National Association ("BMO"), a US subsidiary of the Bank of Montreal, a Canadian financial

institution [Ref p.397].  Fresno First Bank ("FFB") would follow BMO as another CSA proxy, listing PSK on February 6, 2025, a mere 57 days after its other partner AltruPay LLC ("AltruPay") was contracted by PSK [Ref p.398, 399 - 407].  With the MATCH listing, PSK's ability to accept credit card transactions was terminated.  In this, *Deep 6 Diaries* could no longer be sold on the PSK site, thus an embarrassing liability to CSA was supressed.  Indeed, nothing at all could be sold on the PSK site, removing CSA's competition entirely.

53.    The standard means of removing a company wrongfully listed on MATCH, and thereby restoring its revenues and recovering falsely seized funds, is through litigation.  About one month after the false filing on MATCH however, and through its government allies, CSA seized $50,000 from PSK's US corporate account at Chase / Paymentech as punishment for supposed money laundering.  Thus, PSK could not afford legal counsel to defend against the false MATCH listing nor to recover the funds seized on the basis of that false listing.

54.    Unable to sell on the PSK site, PSK created an Amazon account to sell *Deep 6 Diaries* there.  Approximately one week later, CSA advised Amazon that *Deep 6 Diaries* was a counterfeit book and demanded it be delisted.  Amazon complied.  *Deep 6 Diaries* was no longer available on any major retail platform and in effect was -and remains- a banned book.  Likewise, PSK instructional guidebooks were unavailable online.  The Canadian Government had succeeded in banning perfectly legal books inside the United States.

55.    In all of this and as one might expect, the loss of retail revenues and related loss to corporate reputation was severe.  But, with the Fifth Circuit Ruling solidly in favor of PSK and no injunctions in place or even filed, there was the prospect of partial recovery.

56.    Armed with this legal vindication, and after a two-year drought of sales, on December 11, 2024 PSK began a relationship with AltruPay, a Texas based merchant account provider, setting up a processing account with them and restarting PSK retail sales.

57.    Almost immediately, though the specific date is unknown, CSA contacted AltruPay to convince them to unlawfully block PSK sales and seize PSK funds, both actions on the false basis of fraudulent PSK activity.  AltruPay agreed to collude with CSA for this purpose.  The first AltruPay email to PSK expressing doubt of PSK's legitimacy was received on Dec 23, 2025.

58.    Between Dec 23, 2025 and March 21, 2025, AltruPay deliberately and repeatedly deceived PSK as to the nature of their concerns.  AltruPay claimed their worries were related to the percentage of PSK transactions in the US vs. in Canada.  On March 21, 2025 however, AltruPay's Chief Operating Officer, Bill Glass, admitted the real reason for AltruPay's behavior as entirely unrelated to percentage of transaction locations.  Rather, wrote Glass;

> ***"The specifics were Canadian Standards Association - Intellectual Property Infringement. You would need to have the right to resell these books***. *Your account was flagged and fined directly by Mastercard*. ***The percentage of transactions between Canada and US is not the issue it is the infringement."*** [emphasis added]

59.    The damages done to PSK by AltruPay conduct were considerable and largely consistent with those previously suffered by PSK from other entities colluding with CSA, as;

-    The constriction and eventual termination of PSK's online sales resulting in financial loss;
-    The cancellation of PSK contracts resulting in the total loss of PSK retail sales;
-    The unlawful seizure of PSK reserve funds in the merchant account's possession;
-    The illegitimate listing of PSK on the international money-laundering MATCH blacklist, and;
-    The unlawful seizure of funds from PSK's corporate bank account.

60.    These damages to PSK by AltruPay are of the same character as the damages meted out by Paymentech, as outlined below. These are fraudulent uses of anti-fraud protections to victimize the innocent to the profit of the guilty. These fraudulent practices are also cyclical. That is, after one merchant account provider has colluded to harm the victim, and the victim desperately signs with a replacement provider, then the cycle restarts with the new provider colluding to harm the victim all over again. Paymentech was the new provider after AltruPay.

**The Paymentech Experience**

61.    With the termination of the AltruPay account, on or about March 19 2025, PSK entered a merchant account agreement with Paymentech, the Paymentech rep was Andrew Lancaster [Ref p.370, 371].

62.    Paymentech on-boarding went without incident, indeed the process was professional and friendly.

63.    On March 24, 2025, PSK learned that CSA had somehow got PSK listed on the MATCH blacklist again. The following Monday morning PSK advised Paymentech (Andrew Lancaster), saying;

> *"Hi Andrew; We have a problem, I'm trying to head it off.*
>
> *"On Friday I learned that our commercial competitor got us on the MATCH blacklist again. They've done this a few times in the last few years. Every time they've done it before we'd suddenly lose our ability to conduct credit card transactions. That's why they're doing it, to sabotage our operations.*
>
> *"There's no basis to their filing. As you may recall, we sell electrical instruction books, not really exotic stuff. While our competitor has tried to litigate us out of existence, we've won our case. Their litigations went all the way to the Supreme Court and in these we've been vindicated, the Court has ruled that we're not doing anything illegal at all.*
>
> ***"In this, I wanted to advise you in the hope that you could route copies of the Court rulings (enclosed) to the right place at Chase to prevent a false shut-down of our merchant account. [emphasis in original]***
>
> *"I enclose Document 75-1 (the Ruling of the Fifth Circuit) ruling that we're not guilty of copyright infringement, Document 91 (District Court Judgement), and the Supreme Court*

*Order refusing to hear my competitor's appeal.* *I can arrange for a letter from our legal counsel if needed.* [emphasis added]

*"So, can we head this off at Chase?"* [Ref p.372]

64. Indeed and as noted above and in evidence, PSK enclosed copies of the exonerating Court rulings and related documents to Paymentech [Ref p.372].

65. Later that morning, Paymentech (Andrew Lancaster) replied, as; "This is wild. Sorry you're doing through this. […] On the [MATCH] notice you received did it tell you what Acquiring Bank submitted that?" [Ref p.373]

66. PSK replied, saying;

*"We didn't receive any notice from anyone. Rather, on a hunch my competitor might've done it again, I emailed the MasterCard MATCH [email] hotline and they advised that I was on it again. Thankfully, they advised which bank my competitor used to put me there (Fresno First Bank). My counsel is getting the Bank to undo the deed they did.*

*"Can you advise the appropriate Chase people of the situation? In my unfortunate experience with MATCH, it takes a couple of weeks to get removed and, in the interim, I want to avoid losing our newly minted Merchant Account functionality.*

*"We're happy to Cc the Chase side on counsel correspondence with the bank for their assurance that we're working on it* [Ref p.374]."

67. Paymentech (Andrew Lancaster) replied that afternoon to advise that he would try to forward the exonerating Court rulings and related documents to the appropriate internal management, as; "I reached out to my manager to see the best team to pre-emptively send this to as it's definitely a unique situation," then asking; "Did they say when you were placed on the MATCH list?" [Ref p.375]

68. PSK responded that afternoon with contextual detail, as;

*"Yes, we were placed on the MATCH list by Fresno First Bank on Feb 6 2025 but, as I noted earlier, we were given no advisory of the listing, I found out just last week.*

*"For background, we were previously listed on MATCH by BMO Bank National Association (aka Harris Bank) on Oct 13, 2022 and previously by another bank (unknown identity) sometime in 2021. FYI, MATCH will advise with this info if asked but only gives the most recent data.*

*"In each instance, the placement on MATCH was instigated by our competitor, CSA Group, on allegations of illegal product sales. As noted, we have not made any illegal product sales and have Court rulings attesting to that. Each time we're listed however, we lose our merchant account resulting in lost sales and damage to corp reputation and, about a month later, money is seized from our Chase account in punishment. Since 2021,*

> *we've lost more than $50k this way and there's no way of getting it back that we've found.*
>
> *"In this, I'm sure you appreciate the concern about losing our merchant account functionality and further looting of our bank account. Thanks for your efforts Andrew* [Ref p.376]."

69. The following morning, March 25, 2025, Paymentech confirmed that he was forwarding the exonerating Court rulings and related documentation "to the appropriate team" [Ref p.377].

70. Throughout April and into the first half of May, 2025, there was no activity on the file. PSK was of the view that Paymentech was respecting the Rulings of the Fifth Circuit Court of Appeals and the Supreme Court.

71. Then, on the morning of May 15, 2025, in an email from Chase Merchant Services (aka: Paymentech), PSK received the following message;

> *"We are closing your payment processing account [sic]*
>
> *"As part of our regular account review, and in accordance with our agreement, we have decided to close your payment processing account effective 5/15/2025. […] We'll stop processing your payment transactions on the above date* [Ref p.378]."

72. Note that this message was sent on May 15, the same as the cancellation date. That is, Paymentech had already terminated the PSK account by the time they advised PSK.

73. Chase Merchant Services (aka: Paymentech) continues;

> *"We may withhold sales transaction proceeds from the date of this notice as a reserve to cover future exposure. […] Please choose another financial institution to handle your account.*
>
> *"We're here to help. If you have questions call us at [number]* [Ref p.378]."

74. PSK called the Paymentech helpline noted in their email. Alas, their warm sentiment that "we're here to help" was not evidenced in navigating the crisis they had created. Paymentech would not advise with any details of the termination of any kind, including the particulars of the charge -that is, the basis for termination. Instead, Paymentech's helpline advised PSK to ask Andrew Lancaster, PSK's Paymentech rep for information.

75. Immediately after calling the Paymentech helpline, PSK called Andrew Lancaster and left a voicemail.

76. Immediately after leaving the voicemail, PSK emailed Paymentech (Andrew Lancaster), as;

> *"Further to voicemail, I have contacted the number on the email and have been advised to call you for more information.*

*"They are unable to advise what the issue / problem is, who made the decision, which dept is responsible, they cannot give any contact information to pursue the matter -this is amazing! How can I deal with a problem Chase won't define?*

*"Please help!  Could you let me know who at Chase to call to sort this?" [Ref p.379]*

77.    Paymentech (Andrew Lancaster) replied that afternoon, saying in part;

*"That is not correct.  I'm in sales [and] we do not receive any [of this] information in sales because of this inherent conflict in interest.*

*"I escalated it to my manager who informed me that your account was closed by our **Fraud-Ops Department**.  I reached out internally and they informed me that they cannot disclose the reasons for the account closure.  Thought processing being they **don't want to 'coach' or help anyone circumvent** their decision. [emphasis added]*

*"That being said, once Fraud Ops closes your account it is closed.  No way to sugar-coat it and I don't want to waste your time saying I'll do x, y, or z.  Once they close it, that's definitive.*

*"I sincerely apologize for the inconvenience.  I don't know why or what happened however you will need to find alternative processing [Ref p.380]."*

78.    In this, Paymentech admits that they terminated the PSK account due to fraud committed by PSK.  The conclusion is clear in their follow-up statement that withholding information from PSK is deliberate in order to prevent fraudulent circumvention of anti-fraud provisions.

79.    Lest there be any doubt of Paymentech's admission of their rationale for termination, their Fraud-Ops Department is entirely focussed on fraud.  There is no other focus of this Department. If Fraud-Ops issued the termination, it was because they designated PSK activity as fraudulent.

80.    Chase (Paymentech) regularly hires for personnel in its Fraud-Ops Department.  A sampling of Chase (Paymentech) job posting is included in the PSK evidence file.  From among these;

*"you will play a crucial role in addressing fraud [...] within the Consumer **Fraud Ops** Strategy team [emphasis added] [Ref p.381]."*

81.    A sampling of activities of Chase (Paymentech) Fraud-Ops personnel includes [Ref p.381 – 392];

-    Review potentially fraudulent payments alerted by bank controls [like MATCH]
-    Investigate fraudulently negotiated items
-    Authenticate, validate, and process Check Fraud
-    Monitor the fraud trends in the portfolio,
-    [You are] driven by fraud strategies and customer impacts from fraud prevention efforts
-    Conducting fraud investigations
-    Your role will encompass the provision of innovative solutions for fraud prevention, detection, and investigations
-    Analyze fraud data to identify patterns and trends,

14

- Mitigate fraud risks and brief senior management on analysis results and fraud trends.
- Solutions for fraud prevention
- Escalate confirmed fraud payments
- You will work closely with the fraud risk technical product team to deliver best in class fraud fighting capabilities

Likewise, a sampling of standard required skills for Paymentech Fraud-Ops hires includes [Ref p.381 – 392];

- Advanced knowledge of fraud prevention strategies and tools.
- Experience in fraud investigations
- Strong working knowledge of Investigations/Fraud Investigations.
- Critical thinking and problem-solving skills for assessing and resolving cases.
- Proactive problem-solving approach with ownership of issues.
- Broad knowledge of fraud
- Fraud risk knowledge
- Research-related field or role

82.    Paymentech's Fraud-Ops Department is focussed on fraud investigations, and this Department designated PSK activity as fraudulent despite possessing Fifth Circuit Appeals Court and Supreme Court Rulings entirely vindicating PSK [Para 52 – 53, 64, 70 ] [Ref p.347 – 364, 365, 368].

83.    There was no fraudulent activity at PSK.  Paymentech's stated basis for termination is false.

84.    In the evening of May 15, 2025, PSK noted that the regular, nightly transfer of revenues ("daily settlement funds") from Paymentech to PSK had been halted [Ref p.394 – 395].  PSK emailed Paymentech (Andrew Lancaster) that evening, as;

> "I note that our funds still in your system appear to have been seized (see email from [this] evening below).  We have been falsely accused of fraud several times by our main competitor and in each of these our Chase accounts have been looted as punishment, a cumulative sum of over $52,000.  I trust you appreciate my concerns of a recurrence.

> "As discussed with you during on-boarding, our competitor's fraud allegations have been proven baseless.  We won in court, their allegations were refuted all the way to the Supreme Court (sent you copies of the Rulings on March 24th).  As the Rulings make plain, there is no fraud.  If we are being targeted on a false basis we do need to address it, and surely must do if we're being hit once again with seizures from our accounts.

> "I would like to have our legal counsel send an advisory noting our vindications in court, the absence of fraud, and the illegitimacy of funds seizures.  Presumably if we can clearly demonstrate our vindication we can head-off further funds seizures and perhaps rescue the relationship.

> **"In this, when you say the account was closed by "our Fraud-Ops Department," are you referring to Chase Paymentech Solutions LLC or Chase Paymentech LLC?** [emphasis in original] [Ref p.393]"

85.    The following morning, Paymentech (Andrew Lancaster) replied, saying;

> *"I do recall this situation. I wish I could give an answer as to why but I genuinely am in the dark myself. Typically its exceeding chargeback ratios but I don't see any chargebacks on the account so that's not it. It could be a card brand violation (Visa/MasterCard rules). Typically that is running your own card, data breaches, non PCI, selling illegal goods, etc. Again I don't think any of those apply either. The other common reason would be excessive risk where we put you're going to do $10,000 annually and you do $100,000 the first month. Also not the case so I am stumped.*
>
> *"I escalated this to my manager who escalated it to our Complaints team. Just trying to pull every lever I can. As a heads up, I was informed any held transactions will be held for 180 days.*
>
> ***"We are Chase Paymentech LLC and Fraud Operations is a department within Chase Paymentech*** *[emphasis added] [Ref p.393]."*

86.    This admission is important, as identifying the "Fraud-Ops" activity as within Paymentech itself rather than a different Chase division.

87.    On May 20, 2025, Chase Merchant Services (Paymentech) emailed to advise that;

> *"We have carefully reviewed your account and are writing to inform you of the decision to stop processing payments for your account ending in 7776 on 05/15/2025 in accordance with our agreement [Ref p.394]."*

88.    This advisory that Paymentech would terminate payments occurred five days after they had executed the termination.

89.    Further, and contrary to their May 20 email, Paymentech termination is not "in accordance with our agreement," for PSK did not consent to fraudulent designation as a criminal enterprise, nor to accept penalties, by fines and / or by termination of service and resulting financial losses, on the basis of such fraudulent designation.  Paymentech is operating in violation of its own Agreement and in defiance of its own declarations.

90.    Paymentech continued;

> *"We have established a reserve account of $3,306.45 by withholding your daily settlement funds and possibly debiting your settlement account [the PSK Chase corporate bank account]. The reserve will be used to satisfy any amounts you owe now or in the future. Any balance will be retained for a minimum of six months after termination [Ref p.394]."*

91.    Paymentech has deliberately designated PSK as a fraudulent entity under what Paymentech already knew to be fraudulent allegations.  As a result, PSK's sales are halted, funds are seized and, with PSK funds looted to the financial benefit of Paymentech and their colluding partners, PSK is deprived of the financial means to defend itself in any venue outside Small Claims Court.

92.      Paymentech's conduct in this regard is disgraceful, fraudulent, and unlawful.

The limited chronology of context and events described above

November 25 2020
- CSA Files in Federal Court against PSK

- The Canadian argument is that private ownership of Canadian legislation should be enforced inside the US without regard to US law and US Court rulings specifically denying the legitimacy of private claims to ownership of law.

July 12 2021
- CSA files an Application for Preliminary Injunction against PSK

March 18 2022
- Federal Court denies the CSA's attempted injunctive against PSK books due to weakness in CSA's position and their unlikelihood of success.

June 5, 2022
- Announcement of the coming book release of *Deep Six Diaries.*

June 27 2022
- PSK's merchant account provider, Stripe, advises that PSK has been designated on the MATCH list for selling "illegal products," less than three months after Federal Court denied CSA's injunctive [March 18, 2022]. The false MATCH filing was done by BMO, though BMO's role was unknown at the time.

- PSK loses its ability to conduct retail sales until signing a new provider, EMS / PaymentCloud

October 13 2022
- PSK's new merchant account provider, EMS / PaymentCloud, advises that PSK has been re-designated on the MATCH list, again by BMO

- PSK again loses its ability to conduct retail sales

October 15, 2022
- Maintenance pages on PSK websites go up

November 13, 2022
- Last article on the Knight website before site transition for the *Deep Six Diaries* book launch.

November 19, 2022
- Start of Amazon sales of *Deep Six Diaries*

November 19 – 30, 2022 (exact date unknown)
- CSA falsely advises Amazon that *Deep Six Diaries* is counterfeit and PSK sales on Amazon halted

January 4, 2023
- Federal Court initially rules against PSK and PSK subsequently launches an appeal

July 16, 2024
- The Fifth Circuit Court of Appeals rules in favor of PSK, reverses the Federal Court ruling

July 30, 2024
- CSA petitions the Fifth Circuit Court of Appeal for an en-banc re-hearing

August 9, 2024
- Mandate is issued reversing the Federal Court ruling.

August 14, 2024
- Fifth Circuit Court of Appeals denies CSA's en-banc petition

September 18, 2024
- Order closing the case in PSK's favor

December 11, 2024
- PSK begins retail sales through AltruPay

January 7, 2025
- MATCH identifies BMO as originator of the PSK / Knight listings of 2022

January 10, 2025
- FFB Enters Consent Order for AML violations

January 21, 2025
- Supreme Court denies CSA's petition to appeal

January 22, 2025
- FFB issues News Release promising to comply with AML cleanup order

January 27, 2025
- Knight makes first call to BMO on the fraudulent PSK / Knight listings

February 6, 2025
- AltruPay breaches PSK contract, halts PSK retail revenue, freezes PSK accounts, seizes PSK merchant account funds.

- FFB lists PSK and Knight on the MATCH list, though this was unknown at the time.

February 19, 2025
- Knight learns that PSKO is also designated on MATCH, placed by BMO's personal designation of Knight

February 28, 2025
- Mastercard falsely advises FFB of PSK "activity that is illegal" twenty-three days <u>after</u> FFB had already placed PSK and Knight on the MATCH list

March 10, 2025
- BMO, through its partners, removes PSK and Knight from its own MATCH listing

March 19, 2025
- PSK begins retail sales through Paymentech LLC, a division of Chase.

- PSK learns that PSK and Knight are still on the MATCH list due to FFB filing on February 6, 2025

March 24, 2025
- Knight provides Paymentech with copies of the Fifth Circuit Ruling, the Court Mandate, and Supreme Court Order List.

- Paymentech confirms receipt and sends the Rulings elsewhere within Paymentech for handling.

May 15, 2025
- Paymentech falsely cancels PSK account for "illegal activities," freezes PSK bank account funds, seizes PSK merchant account funds.


**The Damage to PS Knight**

<u>Financial Harm</u>

93.    Damages to PSK are born by Knight, in salary and in lost future financial security.  As with many single operators of small businesses, the line dividing corporate and personal can be hazy.  In this case, the PSK office is Knight's living room, the PSK desk is Knight's desk, and Knight owns one computer serving both business and personal purposes.  As PSK is the only income for Knight, the two are inextricably linked; losses for one are experienced by the other.  In this context, the total loss of PSK retail sales was a direct and devastating loss for Knight.

94.    Paymentech fraudulently shutdown PSK retail activity and is responsible for consequent and ongoing financial losses;

95.    The loss of retail presence at any time is bad for corporate reputation but losing sales ability after a two-year sales absence and after much marketing hype about coming back, is incredibly expensive damage.

96.    Further, Canadian electrical law is updated once every three years, so purchasers are usually repeat customers, preferring familiarity with PSK formatting, presentation, etc.  This is especially true in academic contexts (use of PSK books in trade school courses).

97.    Switching to a different format because PSK products are unavailable is difficult to reverse. Corporate purchasing decisions tend to be locked in, as in "our company buys this product, we are this kind of company."  Likewise, academic markets have to rebuild their course syllabi

around CSA products when PSK products are unavailable and are unlikely to rebuild again for return to PSK if PSK is perceived as unreliable. In other words, Paymentech damages are not one-off costs; they are recurring, multi-year damages, recovery from which is long-term and tenuous.

98.    As a competitor, CSA has long denigrated PSK in the market with allegations of illegitimacy and unreliable availability, the latter usually caused by CSA itself.

99.    There are specialized consultants capable of providing cost analysis of reputational harm. The studies produced by these specialists are very expensive and well beyond the means on PSK under the circumstances.

100.    Paymentech also fraudulently seized PSK funds from its Chase accounts, thus harming Knight without lawful basis. Paymentech has admitted the looting of PSK's account and the false basis for that looting.

101.    Paymentech also fraudulently initiated a freeze of the PSK corporate account at Chase, thus harming Knight without lawful basis.

102.    Without revenues, PSK cannot afford an accountant to file corporate income tax, needful to subsequently file Knight's personal tax. Of course, without revenue and without salary, no tax is owing but in consequence neither detail is available on Knight's current impecuniosity.

103.    Due to Paymentech's conduct and that of its partner FFB and other CSA directed proxies, Knight has no savings, no investments, no pension, and no other source of income. PSK was and remains Knight's only source of financial security and retirement.

104.    In this context, Knight's direct financial damage, tied to PSK damage, is long-term, substantial and debilitating, and also noticeable within this action. That is, one consequence of Paymentech's sabotage of PSK sales is the absence of financial heft to hire legal counsel. Perversely, Paymentech's conduct impairs the victim's effort to defend himself.

105.    Abuses of the MATCH list have been the subject of recent and ongoing PSK discussions with a number of Congressional offices. Deliberately listing one's competitor by false allegations on the MATCH list in order to sabotage their sales and reputation, then on the basis of that false listing to seize the contents of their banks accounts to deprive them of the financial means to defend themselves is a widespread practice. PSK is using its experience with Paymentech to encourage regulatory reform.

Reputational Harm

106.    Paymentech's fraudulent conduct has likewise badly damaged PSK's and Knight's reputation.

107.    As a competitor, CSA has long denigrated PSK in the market with accusations of illegitimacy and unreliable availability, the latter usually caused by CSA and proxies like Paymentech or FFB engaging in illicit means to impede PSK business. The fraudulent FFB MATCH filing and consequential PSK embarrassment of loss of market presence are unquestionably damaging.

Further, the impediments to PSK product availability appear to confirm CSA / BMO / FFB's false allegations, providing the venire of respectable and authoritative third-party affirmation of PSK's illegitimacy.

108.    This is perverse, in that PSK won its case at the Fifth Circuit whereat PSK and Knight's conduct was deemed unambiguously lawful and legitimate.  That is, CSA / BMO / FFB / Paymentech have buried Knight in the damages of having lost their case when Paymentech was in full knowledge that PSK and Knight had won.  It is as though the rulings of the Fifth Circuit held no authority over these people; they would ensure the market treated Knight as though PSK had been found guilty.  In this, Paymentech's conduct is contemptuous of US court.

109.    Paymentech's defiance of the Fifth Circuit ruling meant that PSK vendors, customers, and contractors were left with the impression that PSK and Knight were guilty, unethical, and unreliable.  Knight had to personally explain to vendors why PSK's automated debit payments were for the first time ever declined and to contractors why PSK was unable to make timely payments for service agreements made in good faith.

110.    Beyond the damning matter of reputational damage to PSK impacting Knight, the name itself is damaged.  That is, PSK is PS Knight Americas Inc; "Knight" is the Plaintiff's last name.  For reference, the founder of PSK was Knight's father, Peter Slim Knight, from which the corporate initials PSK are derived.  Knight's reputation is tied to PSK due to the family name and due to longevity.

111.    In this, reputational damage to Knight is widespread, well beyond the confines of electrical guidebook publishing, and will surely manifest in other financial endeavors pursued by Knight.

112.    As noted, there are specialized consultants capable of providing cost analysis of reputational harm [Para 100].  The studies produced by these specialists are very expensive and well beyond the means on PSK or Knight under the circumstances.  In this, the best damage assessment Knight can offer is that the sum of all direct and indirect damages, both immediate and long-term, resulting from Paymentech's fraudulent conduct is into the millions of dollars.

113.    In the absence of specialized accounting, yet in the presence of recent precedent of Canadian bank AML abuses in USA v. TD (2024) [2:24-cr-00667-ES], Knight appeals in the calculation established by that court and takes it as a given that precedent in one case of Canadian AML abuse will be adhered to with another of Canada's AML abusing bank proxies, in this case through its partners FFB and Paymentech.


Personal Damage

114.    However difficult to quantify, Knight has notable experience in struggling through multiple years of expensive litigation without the revenues to pay PSK counsel, vendors, or his own rent and groceries.  As with all such experiences, one gets creative and one gets through but, as the basis for Knight's treatment at the hands of Paymentech was entirely fraudulent, one must insist upon a reckoning.

115.  This is the fourteenth year of the Canadian Government's war on Knight, PSK and, until his death in 2016, Knight's father Peter Knight.  For Knight, this is the fourteenth year of sustained, elevated stress.  It is the fourteenth year of living like a pauper, eating mean, living cheap, and barely getting by.  Paymentech's fraudulent conduct in the service of CSA was surely contributory to their partner's war on Knight, and Paymentech's behaviour also exacerbated Knight's impecuniosity by cutting off PSK revenues entirely which comprise the only source of Knight's personal salary and retirement.

116.  Paymentech has chosen to participate in a long-term campaign of "lawfare;" the abuse of governmental authority and legal processes, in this instance featuring Paymentech's willful collusion in defiance of a Fifth Circuit Court Ruling and a fraudulent MATCH filing by their partner FFB, both in collusion with a foreign government.

Placeholder Amount

117.  The sum of requested compensation to Knight is listed as a "placeholder amount."  As noted, the financials of PSK and Knight are unavailable due to the conduct of Paymentech and are therefore unavailable to be used as partial basis for assessing compensation [Para 100, 103, 113].

118.  In the context of the known damage to Knight and his business, the extrapolated damages known yet undocumented, and the further context of the reprehensible and deservedly punishable conduct of Paymentech which caused all of these, Knight will accept the sum of compensation assessed by the jury in their judgement of the case.  In this, the noted sum of compensation of $20MM is a placeholder sum for use in jury deliberation.

Causes of Action

Breach of Contract

119.  As the Fifth Circuit had Ruled in favor of PSK and Knight, finding them innocent of what Paymentech and FFB declared them guilty of, there was no basis for termination of the merchant account contract.  In this, Paymentech's conduct with regard to contract was fraudulent and unlawful.

120.  Paymentech's incuriosity and resulting total lack of due diligence to confirm their partner FFB's allegations against PSK are not consistent with due diligence requirements of financial entities operating in the US.

Lantham Act

121.  The Lantham Act is one of several laws addressing fraud committed by banks or financial institutions, focussing on deceptive practices, misrepresentation, or intentional misconduct.

122.  Lantham is relevant in this instance because Paymentech's fraudulent treatment of PSK and Knight is deceptive to financial vendors of PSK in misrepresenting PSK and Knight's conduct with

regard to the law, was intentional, and was made in a commercial context causing lost sales and reputational harm to Knight's corporate asset and only source of income.

123.    Paymentech's conduct against PSK and Knight is fraud.  Paymentech has been caught colluding in the use of an anti-fraud blacklist to harm an innocent TX company to the benefit of a fraudulent Agency of a foreign government.  This is also perverse.  Paymentech's collusion in the fraudulent use of anti-fraud protocols is an inversion -that is, a perversion- of their legislated purpose.

## Commercial Disparagement

124.    Treatment of PSK and Knight as guilty of conduct which the Courts had already found them innocent of, and such treatment undertaken in the knowledge of obvious consequential harm (in this instance, sabotaged sales and financial and reputational harm to PSK and Knight), is basis for a finding of trade libel, provided the designation caused financial loss.  And clearly, it has.

125.    Paymentech wasn't trying to treat either PSK or Knight kindly.  Paymentech knew or was deemed to know that treating PSK and Knight as criminals would be financially and reputationally destructive to Knight.  Paymentech's behavior toward PSK and Knight was therefore malicious, caused financial loss, and meets the legal criteria of commercial disparagement.

## Defamation

126.    Treating PSK and Knight as guilty in the full light of day, in the presence of demonstrated proof of falsity, malice and harm, and in further defiance of the Fifth Circuit Ruling are basis for a finding of defamation.

127.    Paymentech is deemed to have had full knowledge of the Court's validation of PSK's sales activity because they were proactively furnished with copies of the Ruling, Mandate and Order.  There is no ambiguity; Paymentech knew Knight was innocent yet chose to list him as guilty.

128.    Paymentech's conduct was therefore to defame innocent parties with the taint and stigma of guilt.  That is, Paymentech and its partner FFB have chosen to involve themselves in a 14-year unlawful harassment and defamation campaign against PSK and Knight.

129.    All aspects of defamation are demonstrable; falsity, malice, and harm.

## Tortious Interference

130.    Fraudulent designations also support claims of tortious interference with business relationships or prospective economic advantage if they disrupt contracts or opportunities.

131.    Causing the total loss of retail revenues, at the hands of Paymentech is quite clearly an instance of tortious interference in the business of PSK and its owner Knight.

Negligence

132.   Paymentech's failure to verify the allegations against PSK and Knight constitutes grounds for a negligence claim, especially if the Knight suffered financial losses due to the failure and provided the claim of Commercial Disparagement is defeated for lack of proven malice.  And this threshold is met.

Breach of Bank Fraud Statute ("BFS") (18 U.S.C. 1344)

133.   The BFS criminalizes knowingly executing or attempting to execute a scheme to obtain money, assets, or property under a bank's control through false or fraudulent pretenses.

134.   The BFS is a very short statute, quoted in full;

> "Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

135.   The reference to "knowingly" refers to awareness of the conduct being engaged in, not awareness of the illegality of that conduct.

136.   There is little maneuvering room for Paymentech.  The DOJ has consistently chosen to retain interpretations of acts covered by the BFS in "the broadest and most general terms." In essence, the BFS applies to any fraudulent act by which property of value held within the authority of a financial institution is acquired by dishonest methods or schemes.

137.   As noted above, PSK accounts were looted by Paymentech on the false basis of the filing of their partner FFB's filing.  As the funds within these accounts were falsely seized and that Paymentech executed the seizures of PSK assets "within the authority of a financial institution," the conduct of the Defendant clearly and easily satisfies the criteria for BFS violation.

138.   The BFS is only actionable in civil litigation indirectly, in cases of fraud committed by a financial institution such as Paymentech, in this instance supporting the claim that their conduct in defiance of its BFS obligations directly harmed PSK and Knight.

Breach of Bank Secrecy Act ("BSA") (31 U.S.C. 5311 et seq.)

139.   The BSA requires financial institutions to maintain honest records and file accurate reports to prevent fraud, money laundering, and other illicit activities.

140.   Paymentech / Chase is a financial institution for purposes of the BSA, as under BSA definitions.

141.   The fraudulent use of anti-fraud protocols and false designations related thereto, is clearly a violation of the BSA, particularly though not exclusively the BSA requirements of due diligence in

AML compliance programs and of accurately reporting of suspicious activity (Suspicious Activity Reports / SARs) with regard to CSA's illicit conduct against US entities such as PSK and Knight.

142.  The BSA is only actionable in civil litigation indirectly, in cases of fraud committed by a financial institution such as Paymentech, in this instance supporting the claim that Paymentech's refusal to comply with its BSA obligations facilitated harm to PSK and Knight.


Breach of Wire Fraud Act (18 U.S.C. 1343)

143.  The Wire Fraud Act applies to financial institutions perpetrating fraud by use of interstate wires, (such as digital transactions typical to banking and including digitally stored blacklists such as MATCH). This statute covers schemes involving false representations or deceit to obtain money or property.

144.  Wire fraud requires three elements, as; 1) use of a "scheme or artifice" to defraud another; 2) an intention to defraud another, and; 3) interstate wires must be used in the act.

145.  In this context; 1) Paymentech fraudulently colluded in the use of an anti-fraud artifice, MATCH, to defraud PSK and Knight, causing significant damage; 2) Paymentech intended that damage to PSK and Knight, indeed harming PSK and Knight was the whole point of their partner FFB's false filing of PSK and Knight on MATCH, and; 3) Paymentech executed this operation from within the United States in collusion with and entity out of State (FFB in CA), on the instruction of a foreign government. All elements are met.

146.  The Wire Fraud Act is only actionable in civil litigation indirectly, in cases of fraud committed by a financial institution such as Paymentech, in this instance supporting the claim that Paymentech's gross violation of its Wire Fraud Act obligations directly harmed PSK and Knight.


Breach of Consumer Financial Protection Act ("CFPA") (Title X of Dodd-Frank Act, 12 U.S.C. § 5481 et seq.)

147.  The CFPB, an amendment to the National Bank Act, prohibits unfair, deceptive, or abusive acts or practices by banks in consumer financial products or services. With respect to Paymentech's fraudulent treatment of PSK and Knight, the CFPB establishes prohibitions against Unfair, Deceptive or Abusive Acts and Practices (UDAP) as follows;

*UDAP Prohibitions 1031 and 1036 of CFPA*

        Unfair Acts or Practices
                Substantial injury to consumers
                Not reasonably avoidable by consumers

        Deceptive Acts or Practices
                Misleading or false representation
                Likely to mislead a reasonable consumer
                Material to consumer decision-making

UDAP Prohibition 1036(a)(1)(B)

> Unfair, Deceptive or Abusive Acts
>> Knowingly misreporting information about a victim's financial behavior
>> Contributing to blacklists or databases that result in unjustified harm

148.    Paymentech's decision to harm PSK and Knight through fraudulent and unlawful termination based on their partner FFB's fraudulent designation of PSK and Knight on an anti-money laundering blacklist is unambiguously unfair, deceptive, and abusive. All CFPA criteria are met.

149.    The CFPA is actionable in civil litigation in instances of direct harm to consumers resulting from deceptive practices such as those of Paymentech. The CFPA is also actionable in support of the balance of the Plaintiff's claim against Paymentech.

Executive Orders and Related Statutes

Executive Order 14161 (January 20, 2025)

150.    Titled; "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," the EO emphasizes enhanced vetting and screening to prevent foreign nationals from undermining U.S. constitutional rights. While focused on immigration, this EO directs agencies against foreign entities which harass, harm or target U.S. citizens to suppress rights.

151.    EO 14161 is not directly actionable in civil litigation but is applicable in support of the balance of Plaintiff's claims. Paymentech's collusion through FFB with an Agency of the Government of Canada, unlawfully operating within the United States, places EO 14161 into relevance in this case.

Foreign Agent Registration Act (FARA) 22 U.S.C. 611 et seq.

152.    FARA requires individuals or entities acting on the instructions or in the interests of foreign governments to register with the Department of Justice and disclose their activities, relationships, and financial compensation. It promotes transparency to prevent covert foreign influence, including actions that could involve harassment or targeting of US persons or entities.

153.    While typically referenced in lobbying activity, FARA also applies to unregistered entities acting on the instructions of a foreign government to intimidate or harm US entities, such as Paymentech and FFB following the orders of the Canadian Government's CSA.

154.    In example, in 2017, RT America was required to register as a foreign agent under FARA for its activities on behalf of the Russian government. Similarly, operating illegal overseas intimidation or coercion actions, like informal police stations (e.g., by the Chinese government), have been prosecuted as unregistered foreign agent activities.

155.    On these basis and precedent, Paymentech is in breach of FARA requirements and should be compelled to lawfully register thereat.

## Punitives and Losses Calculation

156.    The case of USA v. TD Bank of October 10, 2024 -barely one year ago- is the nearest precedent on which to gauge equivalent AML violations, as a guideline from criminal law to inform this civil proceeding.  While the subject vehicle is identical (anti-money laundering / anti-terrorism protocols), and the core body of applicable law is identical (AML focussed legislation and EO's, as noted above), and while the origin country of the violating foreign bank is identical (Canada), there are relevant differences between this case and USA v. TD Bank as follows;

157.    The sums affecting PSK and Knight are lesser than those noted in USA v. TD Bank, yet are greater as a percentage -and indeed in absolute terms- than losses suffered by the Plaintiff in TD Bank, namely the Government of the United States.  The Government Plaintiff in this critical precedent claimed no financial losses worth noting.

158.    In the context of no losses to the Government Plaintiff in the precedent case, in taking the legislation and EO's applicable to both this plea and that case, the ratio of punitives to forfeiture / plaintiff loss recovery was 3:1.  That is, of the $1.886 billion applicable, 76% took the form of punitives and 24% in forfeiture / plaintiff loss recovery.  The USA v. TD Bank settlement was to have been a watershed, the largest banking settlement ever; a sort of high-profile warning message to other foreign banks against AML or equivalent fraudulent practices inside the United States.

159.    This filing notes a compensation sum of $20MM and identifies this figure as a placeholder value [Para 8(h)].  For reasons as outlined above [Para 118 - 119], due to Paymentech's conduct it is impossible to quantify the financial losses suffered by Knight.  In this, and in the above context of Knight's treatment by Paymentech and demonstrated damages therefrom, and in the further context of Paymentech's conduct with regard to Knight and in relation to, and at variance from, its legal obligations as a financial institution, the Plaintiff is content to accept whatever sum of compensatory and punitive value is decided by the Jury.

## Plea to the Court

160.    Paymentech fraudulently designated PSK as an entity engaged in fraudulent activity while in possession of fully exonerating evidence.  The Fifth Circuit Court of Appeals and Supreme Court fulsomely disposed of this issue in Rulings on favor of PSK (on Aug 9, 2024 and Jan 21, 2025 respectively).  There is not, nor has there ever been, fraudulent activity conducted by PSK. Paymentech was in possession of these exonerating Rulings and was aware that PSK was not engaged in fraud when it listed PSK as engaged in fraud.

161.    Paymentech has admitted that it cancelled its contract with PSK based on allegations of fraud.

162.    PSK assumes that Paymentech received a threat letter and / or false allegations against PSK and Knight from CSA directly or via Paymentech's partner FFB, though as yet we have no evidence of

this. Discovery is expected to illuminate the specific origins of the fraudulent MATCH listing and whether encouragement or inducements had been given Paymentech to harm PSK.

163. In the context expounded in the paragraphs above and as elsewhere noted [Para 8], Knight seeks;

    a. A Finding that the PSK contract was falsely terminated by Paymentech;

    b. A Finding that Paymentech falsely designated PSK as an entity engaged in fraudulent activity while in possession of the fully exonerating Fifth Circuit Ruling;

    c. A Finding that Paymentech's fraudulent conduct toward PSK and Knight constitutes a breach of contract;

    d. A Finding that by its fraudulent conduct toward Knight and his company, Paymentech is responsible for resulting financial harm on PSK and, directly and by extension, Knight, and an Order for compensation;

    e. A Finding that by its fraudulent conduct toward PSK and Knight, Paymentech is responsible for public disparaging of PSK and misrepresenting PSK conduct, constituting false, misleading and deceptive business practice, is a defamation of PSK and, directly and by extension, Knight, and an Order for compensation;

    f. An Order that Paymentech remove its false designation of PSK as involved in fraudulent conduct and restore the PSK contract, amended to preclude unilateral termination in the absence of unlawful conduct by PSK;

    g. An Order for compensation in the sum of all matters being $20MM, a placeholder amount;

    h. A Finding in this matter before the Court that Paymentech is under the direction of FFB, itself under the direction or control of the Government of Canada through the latter's Agency; CSA;

    i. A Finding that Paymentech has, in this instance, unlawfully operated as an arm of a foreign power (Canada) inside the United States to impede, harass, and harm a citizen of the United States (PSK) and its owner (Knight), and;

    j. A Finding that based on the above, Paymentech is in breach of the following Causes, Federal and State Statutes and Executive Orders, subsequently actionable in criminal proceedings, listed as;

        - Breach of Contract
        - Lantham Act
        - Commercial Disparagement
        - Defamation
        - Tortious Interference
        - Negligence

- Bank Fraud Statute
- Bank Secrecy Act
- Wire Fraud Act
- Consumer Financial Protection Act

**Plaintiff's Name**
Gordon Knight

**Plaintiff's Signature**

Dee 01/2025

**Date**